CHESHIRE HOSPITAL,
Plaintiff-Appellant,

v.

NEW HAMPSHIRE–VERMONT HOSPI-
TALIZATION SERVICE, INC. d/b/a
Blue Cross-Blue Shield of New Hamp-
shire-Vermont; Richard S. Schweiker,
Secretary of Health and Human Serv-
ices, Defendants-Appellees.

No. 82–1097.

United States Court of Appeals,
First Circuit.

Argued June 4, 1982.

Decided Sept. 16, 1982.

Jon S. Richardson, Manchester, N. H., with whom Daniel N. Gregoire, and Sheehan, Phinney, Bass & Green, Manchester, N. H., were on brief, for appellant.

Clifford M. Pierce, Asst. Regional Atty., Dept. of Health and Human Services, Boston, Mass., with whom W. Stephen Thayer, III., U. S. Atty., and Robert J. Lynn, Asst. U. S. Atty., Concord, N. H., was on brief, for appellees.

Before CAMPBELL and BREYER, Circuit Judges, PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

Cheshire Hospital, a 170 bed health care facility located in Keene, New Hampshire, is a provider of services to patients covered by Medicare [1], the national health insurance program for the aged. Under Part A [2] of the Medicare program, Cheshire is entitled

---

* Of the District of Rhode Island, sitting by designation.

1. The Medicare Act is formally known as the Health Insurance for the Aged Act and is codified at 42 U.S.C. §§ 1395 *et seq.*

2. Part A of Medicare, 42 U.S.C. §§ 1395c *et seq.,* provides for the payment of inpatient hospital and related post-hospital benefits for covered individuals. Part B of Medicare, 42 U.S.C. §§ 1395j *et seq.* establishes a voluntary supplemental health insurance program which provides eligible individuals with payment for physicians' services and other health related needs. Only reimbursement under Part A of Medicare is at issue here.

to reimbursement for the reasonable costs of providing these services. 42 U.S.C. § 1395f(b). This appeal concerns the proper determination of reasonable costs under the program. In large part we agree with the district court that the administrative determination in this matter was not arbitrary, capricious, or an abuse of discretion. However, because administrative clarification on one point seems necessary, a limited remand is required.

## I. Facts

The controversy in this case involves the proper treatment of interest expense incurred by Cheshire Hospital in 1977. The facts pertaining to this expense are not in dispute. In April, 1971, Cheshire incurred $9,450,000 in debt through the sale of revenue bonds issued under the auspices of the New Hampshire Higher Educational and Health Facilities Authority (NHHEHFA). The proceeds of this financing were used to construct a new hospital facility in Keene, New Hampshire, a facility which all parties agree was necessary to meet the medical needs of the community. Pursuant to the bond agreement, $880,000 of the proceeds of the bond sale were deposited in a Debt Service Reserve Fund (DSRF) which was created to provide security for the bondholders.[3] The funds in the DSRF are held by an independent trustee, the Shawmut Bank of Boston, N. A., which invests them in government and government-guaranteed securities.

The bond agreement provides that the amount of funds in the DSRF must be maintained at a level equal to the maximum amount of interest and principal which remains payable in any one year period under the agreement. In case of a default by Cheshire, the trustee is authorized to make immediate payment to the bondholders from the funds maintained in the DSRF. If no default occurs, the interest income earned on the DSRF (and any other amounts which exceed the required level of

funds in the DSRF) flow into the Project Reserve Fund, a fund created to provide for any extraordinary repairs and maintenance which the hospital facility may require. When the funding requirement of the Project Reserve Fund is met, any surplus from the DSRF or the Project Reserve Fund, flows into the Redemption Fund. The bond agreement specifies that when the amount of money in the DSRF, the Project Reserve Fund, and the Redemption Fund equals the amount of outstanding principal and contingent and accrued interest owed on the bonds, the money in the three funds will be used to redeem the bonds.

Cheshire filed a Medicare cost report for the year ending June 25, 1977 in which it claimed as an allowable cost the amount of annual interest it had paid on the 1971 revenue bonds. Blue Cross-Blue Shield of New Hampshire-Vermont, a fiscal intermediary appointed by the Secretary to assist in the administration of the Medicare program,[4] disallowed as a reimbursable cost $51,995 of this interest expense. The intermediary made this adjustment because the Medicare regulation known as the offset rule requires that interest expense "[b]e reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or a provider's qualified pension fund is not used to reduce interest expense." 42 C.F.R. § 405.419(b)(2)(iii). The intermediary determined that $51,995 in interest income earned on funds in the DSRF was investment income which was not within either the gifts and grants exception or the funded depreciation exception of the regulation, and that an offset of allowable interest expense was therefore required.

Following the intermediary's issuance of its final notice of program reimbursement,

---

**3.** All parties appear to agree that the creation of the DSRF was necessary to satisfy the requirements of the NHHEHFA and the bond market.

**4.** The Secretary is authorized to enter into such arrangements by 42 U.S.C. § 1395h.

Cheshire sought review of the intermediary's determination before the Provider Reimbursement Review Board (PRRB) pursuant to 42 U.S.C. § 1395oo(a). After hearing testimony and receiving documentary evidence, the PRRB affirmed the determination of the intermediary on March 3, 1981. On March 25, 1981 the Secretary declined to reverse, affirm or modify the decision of the Board, and the decision became a final one for purposes of judicial review. Cheshire then sought such review in the district court pursuant to 42 U.S.C. § 1395oo(f). Under the limited scope of review provided by 42 U.S.C. § 1395oo(f), the district court entered summary judgment in favor of the intermediary and the Secretary. *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 528 F.Supp. 1104 (D.N.H.1981). This appeal followed.

## II. Interpretation of the Offset Rule

Cheshire's principal contention in this case is that the Secretary erred when he determined that interest income earned on the DSRF was investment income within the meaning of the offset rule of 42 C.F.R. § 405.419(b)(2)(iii), and required that such interest income be used to offset reimbursable interest expense. We approach this question mindful of the limited scope of judicial review provided for by statute.[5] Specifically, we are authorized to set aside agency actions, findings, and conclusions only if we find them to be:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law; or

(E) unsupported by substantial evidence. 5 U.S.C. § 706.

Moreover, in this case appellant is challenging an agency's interpretation of its own regulation. It is well settled that in such cases courts should afford considerable respect to the agency's interpretation.[6] *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). Generally, such an interpretation is of controlling weight, unless the reviewing court determines that it is plainly erroneous or inconsistent with the regulation. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Deference is particularly appropriate in an area that is as complex as the field of Medicare reimbursement. In such an area "[m]atters of accounting, unless they 'be the expression of a whim rather than an exercise of judgment,' are for the agency." *Hospital San Jorge v. Secretary of Health, Education & Welfare,* 616 F.2d 580, 589 (1st Cir. 1980) (Campbell, J. concurring) (*quoting American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 237, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936)).

Nevertheless, our deference to an agency's interpretation of its own regulations is not total. We still must examine the agency's interpretation to determine if it is consistent with the language of the regulation and with the purpose which the regulation is intended to serve. *Northern Indiana Public Service Co. v. Porter County*

---

**5.** 42 U.S.C. § 1395oo(f)(1) states that actions for judicial review shall be tried pursuant to the applicable provisions of Chapter 7 of Title 5. These are codified at 5 U.S.C. §§ 701–706.

**6.** Cheshire argues that the district court afforded undue deference to the Secretary's interpretation. It concedes, however, that the lower court articulated the proper standard of review. Cheshire's contention is that the district court

applied the standard incorrectly when it deferred to an interpretation of the regulation which was inconsistent with the purposes and policies of the regulation and the statute under which the regulation was promulgated. This argument will be considered in the context of the specific arguments made by Cheshire with respect to the Secretary's interpretation of the regulation.

*Chapter of the Izaak Walton League of America, Inc.,* 423 U.S. 12, 15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir. 1980). Should we decide to accept the agency's interpretation of its regulation, we must then consider whether the regulation so interpreted is consistent with the statute under which it is promulgated. *See United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977). Regulations which are inconsistent with the statute, or contrary to the manifest purposes of Congress in enacting the statute, must be set aside as contrary to law. *Id.; Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974).

With these principles in mind we turn to the question at hand. Cheshire's first argument is that interest income earned on the DSRF should not be considered as investment income of the hospital because this interest is not subject to the hospital's control and confers no definable benefit on the hospital. This contention is clearly at odds with the undisputed facts of this case. The record clearly reveals that the interest income earned on the DSRF will be used at some point in the future to discharge the financial obligations of the hospital. The funds may be so utilized in the short run if Cheshire suffers financial setbacks and defaults on its obligations, or the funds may be utilized in the long run to redeem outstanding bonds. In either case, the funds in the DSRF, and the interest income earned thereon, will be used to satisfy Cheshire's financial obligations to its bondholders, thereby conferring a substantial benefit on the hospital.

Since the interest earned on the DSRF will ultimately benefit Cheshire, we do not believe it is unreasonable to treat such interest as investment income of the hospital. In fact, such treatment is completely consistent with other Medicare regulations which require cost data to be prepared on the accrual basis of accounting. 42 C.F.R. § 405.453(a). The regulations specify that "Under the accrual basis of accounting, revenue is reported in the period when it is

earned, regardless of when it is collected...." 42 C.F.R. § 405.453(b)(2). Similarly, the income earned on the DSRF can reasonably be treated as investment income in the year in which it is earned, despite the fact that it may not be collected—i.e. used for Cheshire's benefit—for some years to come.

Cheshire also argues that treating interest earned on the DSRF as investment income is inconsistent with the purpose of the offset rule of 42 C.F.R. § 405.419(b)(2)(iii). In support of this contention, plaintiff relies on *Illinois Central Community Hospital, Inc. v. Schweiker,* [1981] Medicare & Medicaid Guide (CCH) ¶ 31,421 (D.D.C. Jul. 10, 1981), in which the court held that income earned on a Remodeling and Improvement Fund was not investment income within the meaning of the offset rule. The fund in question was similar to the DSRF in that it had been established with the proceeds of the sale of bonds and was under the control of an independent trustee. Disbursements from the fund were to be used to pay for specific projects to modernize the hospital.

In deciding that interest earned on the fund was not investment income, the court stated that the Secretary's contrary interpretation was a broad reading of the regulation which went "beyond any apparent rationale supporting the offset requirement." *Id.* at 9120. The court noted that the rationale for the offset requirement is twofold:

> First, it assures that a provider will not borrow money at Medicare's—and the taxpayer's—expense when it has investment funds available which could be applied to fill the need for capital. Second, it guarantees that a provider will borrow only what is needed to fulfill capital requirements related to providing services under the Program, since the return on any excess borrowing will be recaptured under the regulation. *Id.*

Neither of these goals were served by applying the offset rule to Illinois Central's Remodeling and Improvement Fund, because this fund had not been established for the purpose of earning investment income

on Medicare-subsidized excess borrowing. Rather, the fund was created to serve a necessary and prudent business purpose. *Id.* at 9121.

Implicit in the reasoning of the *Illinois Central* court is the premise that the offset rule's sole purpose is to deter excess borrowing and thereby prevent providers from obtaining financial advantage from trading on the Medicare system. Cheshire argues that this purpose is not served by applying the offset rule in the case at bar because it is undisputed that the DSRF was set up as a necessary element of a bond financing agreement, and not as an attempt to trade on the Medicare system. The Secretary, however, argues that the purpose of the offset rule is not just to deter excess borrowing. He contends that the offset rule serves the additional purpose of ensuring that providers are reimbursed only for those costs which they actually incur, and that application of the offset rule to Cheshire's DSRF is fully consistent with this second purpose of the regulation.

▮ The Medicare Act allows providers to be reimbursed for the reasonable cost of providing services to individuals covered by the program. 42 U.S.C. § 1395f(b). The Act further states that, "The reasonable cost of any services *shall be the cost actually incurred,* excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A), (emphasis added). Reimbursable costs are thus limited by statute to costs actually incurred by providers. In this case, the Secretary has applied the offset rule to reduce the interest expense paid by Cheshire on $9,450,000 in borrowing by the income earned on the DSRF which will confer a substantial benefit on the hospital in the future. In so doing, the Secretary has merely limited the amount of Cheshire's reimbursement to the actual or net cost of its borrowing, i.e. the cost of such borrowing less any benefit derived therefrom. Such a determination clearly serves the purpose of the Medicare Act which limits reimbursement to costs actually incurred by the provider.[7]

▮ We realize that the Secretary's application of the offset rule in this case may have an adverse impact on the hospital's cash flow. This is because the hospital will be required to pay the full amount of the offset interest in the current year, but will only obtain the benefit of the DSRF interest income in some future year. In light of this, the district court noted that it would be "reasonable to consider allowing plaintiff to proceed now without the earnings reduction until such time as those earnings are utilized to plaintiff's direct benefit, *e.g.*, retiring the outstanding bonds." *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 528 F.Supp. at 1109. The court nevertheless found that the Secretary's decision not to adopt this approach was not an abuse of discretion. We agree.

The Secretary points out that deferring any offset until the time when the income earned on the DSRF is actually used to benefit the hospital could jeopardize the Secretary's opportunity to make any offset whatsoever. In the year in which the DSRF income is used, the hospital might no longer be a participant in the Medicare program or might have no interest expense which could be offset by the investment income. In either case, application of an offset would be impossible. It is true that

---

7. We note that this case is distinguishable from our decision in *Hospital San Jorge v. Secretary of Health, Education & Welfare,* 616 F.2d 580 (1st Cir. 1980), in which we invalidated a Medicare regulation which offset the reimbursable costs of a hospital's general service departments by the profits which the hospital earned on the leasing of space in its radiology department. That decision rested on the ground that the regulation in question violated the fundamental principle of cost accounting that "revenues engendered by costs of one unit are ordinarily not to be set off against costs of another unit." *Id.* at 586. Here we are dealing with the offset of costs which are not limited to one cost accounting unit, but which pertain to the entire hospital facility. These costs are being offset by revenue which likewise is not generated by one unit. There is thus no violation of fundamental cost accounting principles as was the case with the regulation challenged in *Hospital San Jorge.*

the Secretary might have dealt with this problem by providing for the recapture of any income not offset in earlier years should a provider decide to leave the Medicare program or have no interest expense to offset at a later date. *See, e.g., Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077 (1st Cir. 1977) (approving Medicare regulation providing for recapture of excess depreciation reimbursement when provider leaves the program). But the choice of a solution to this problem is a matter committed to the Secretary's discretion, and we cannot say that his decision to apply an immediate offset, instead of a potentially more burdensome recapture approach, constitutes an abuse of discretion.

 Cheshire's final argument in this regard is that the Secretary's application of the offset rule to income earned on the DSRF is contrary to the Medicare statute and must therefore be set aside. The Medicare Act specifies that regulations which govern reimbursement must:

> take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.... 42 U.S.C. § 1395x(v)(1)(A).

Cheshire claims that if it does not receive reimbursement for the $51,995 of offset interest expense, it will be forced to cover Medicare's share of this expense from other sources, and that the only other source

available is revenue from non-Medicare patients. The Secretary's interpretation of the offset clause will therefore require the necessary costs of providing services to Medicare patients to be borne by non-Medicare patients in violation of the clear mandate of the Medicare Act.

It is clear, however, that application of the offset rule does not permanently shift costs from Medicare patients to non-Medicare patients, since Cheshire is being reimbursed for Medicare's share of the actual costs incurred by the hospital in connection with its borrowing. At most, the application of the offset rule shifts the reimbursement of costs from one time period to another by requiring an immediate offset of interest expense instead of a later offset when the investment income in the DSRF becomes available for use by the hospital. As we noted above, this may have an adverse effect on cash flow, and it is possible that in some circumstances a Medicare provider might have to remedy this problem by imposing additional charges on non-Medicare patients. We need not decide, however, whether this would constitute an unlawful shifting of costs under the Medicare Act. *Cf. Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1081 n.10 (1st Cir. 1977) (upholding Medicare regulation despite fact that it had some effect on provider's cash flow). For in the present case it is clear that Cheshire has sufficient excess revenues to pay the full amount of the offset interest expense without having to impose additional charges on non-Medicare patients.[8] Thus, it is clear that no impermissible cost shifting is required of Cheshire in the case at bar.

III. Violation of Due Process

Cheshire argues that the due process clause requires that a provider's reliance on the clear, unambiguous, and settled understanding of Medicare regulations must be protected from retroactive changes in the interpretation of those regulations which

---

8. The record indicates that Cheshire has a Medicare utilization rate of 38.3%. If Cheshire were to prevail the Secretary would be obliged to reimburse Cheshire for 38.3% of its allowable costs, or $19,914 of the $51,995 which is disputed here. The record reveals that Cheshire had excess revenues for the year ending June 25, 1977 of $328,242.

destroy vested rights. It contends that it relied on the settled understanding that income earned on a debt service reserve fund was not investment income within the meaning of the offset rule in structuring its 1971 financing transaction. Specifically, it decided to deposit $1,100,000 of its gift funds in the construction fund which was used to build its new facility; whereas, had the hospital been aware that income earned on the DSRF was subject to the offset rule, it would have deposited its gift money in the DSRF, thus making the income earned on the DSRF exempt from offset.[9] In 1974 or 1975, however, in reviewing the request for reimbursement by Rutland Hospital, the Secretary interpreted the offset rule to be applicable to income earned on debt service reserve funds. Cheshire claims that the retroactive application of this interpretation to a 1971 transaction violates the dictates of fundamental fairness embodied in the due process clause.

In analyzing regulations[10] which are retroactive in effect, we have noted that "laws that unsettle settled rights can be harsh, and they deserve a special scrutiny." *Adams Nursing Home of Williamstown, Inc. v. Mathews,* 548 F.2d 1077, 1080 (1st Cir. 1977). We also noted, however, that "not every law that upsets expectations is invalid; courts have generally compared the public interest in the retroac-tive rule with the private interests that are overturned by it." *Id.* In applying this analysis, a critical consideration is the extent to which a retroactive rule or interpretation adversely affects the reasonable expectations of concerned parties. *Id.* at 1081.

Central to Cheshire's argument that retroactive application of the Secretary's interpretation will adversely affect reasonable expectations, is the contention that it was settled law in 1971 that income earned on debt service reserve funds was not investment income within the meaning of the offset rule.[11] Cheshire supports this contention by pointing to the expert testimony of accountant Stephen Purdy before the PRRB which purportedly shows that there was a settled industry understanding that reserve fund interest would not be treated as investment income under the offset rule. The hospital also relies on a letter which it received from the Secretary's fiscal intermediary in January 1971 which stated that Cheshire's financing transaction would allow the hospital to be reimbursed for necessary and proper interest. Finally, Cheshire points to the fact that the Secretary did not develop his interpretation of the offset rule until 1974 or 1975, and did not apply this interpretation to Cheshire until 1977, as further evidence that the Secretary's interpretation is contrary to the settled understanding of the offset rule in 1971.

9. The offset rule specifically exempts from offset income earned on gifts and grants which are held separate and not commingled. 42 C.F.R. § 405.419(b)(2)(iii).

10. The present case, of course, is not concerned with a new regulation which is being given retroactive effect, but with the retroactive application of a new interpretation of an old regulation. We cannot dismiss the problem of retroactivity, however, merely because we are dealing with the interpretation of a regulation. Professor Davis has observed:

> If interpretative rules were always merely interpretations of law that already exists, they could never be retroactive, for if they fail to reflect the true meaning of the law they interpret, they would be invalid for that reason, and if they reflect that meaning they do not make law retroactively. The obvious reality is, of course, that what is done in the name of interpretation often adds to the

meaning that is already in what is interpreted; for instance, the Supreme Court obviously makes law when it overrules its own prior decisions interpreting due process.

2 K. Davis, Administrative Law Treatise § 7:23 at 112 (2d ed. 1979) (emphasis in original).

The considerations which affect whether a new regulation should be given retroactive effect, therefore, are also relevant to determining whether a new interpretation should be applied retroactively. *Id.* See *Anderson, Clayton & Co. v. United States,* 562 F.2d 972, 985 n.30 (5th Cir. 1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978).

11. Appellant concedes that, " 'It is retroactive change of settled law, not retroactive settling of unsettled law, which may produce unjust results.' " Brief of Appellant at 21 (*quoting* K. Davis, Administrative Law Text, § 5.05 at 135 (3d ed. 1972)).

 The court does not believe that these facts, considered as a whole, demonstrate that it was settled law in 1971 that the offset rule did not apply to income earned on debt service reserve funds. It is significant that Cheshire does not point to any decision or ruling by an agency or a court which confirms this view. It can only rely instead on what it claims was the settled understanding of the industry. This is insufficient for two reasons. First, it is questionable whether any such settled understanding existed. Plaintiff's expert, Stephen Purdy, testified that there were no discussions within the industry in 1971 as to whether or not an offset would be applied to income earned on debt service reserve funds.[12] It is difficult to believe that a settled industry understanding could emerge in the absence of any discussion of the issue. Second, even if there was a settled industry understanding, this understanding could not be transformed into settled law in the absence of some indication that the Secretary concurred in this understanding. *See St. Francis Memorial Hospital v. United States,* 648 F.2d 1305, 1311 (Ct.Cl.1981) ("Reliance on one's own interpretation of an imprecise regulation does not create an entitlement based on that interpretation, or a violation of due process when the administrator or court adopts another reading.") No such indication was ever given in this particular case.

Cheshire's contention that its position is supported by the January 1971 letter it received from fiscal intermediary is equally unavailing. The letter states only that Cheshire will be reimbursed for necessary and proper interest expense; it says nothing about whether the offset rule will be applied to DSRF income to determine the amount of necessary and proper interest. The Secretary's delay in applying the offset rule to debt service reserve fund income likewise does not indicate that the contrary interpretation of the offset rule was settled law in 1971. The record reflects that the Secretary first applied the offset rule to a debt service reserve fund in 1974 or 1975 in ruling on a request for reimbursement for 1972. Given the fact that hospital revenue bonds were still a recent phenomenon as late as 1971, this delay is hardly of a sufficient magnitude to have created settled law in this area. In short, we are forced to conclude that there was no settled law with respect to the application of the offset rule to debt service reserve funds in 1971. Given this finding, the Secretary's retroactive application of his interpretation of the rule can hardly be said to interfere with any significant reasonable expectation of the plaintiff. In light of this, there is clearly no violation of due process.

## IV. Administrative Procedure Act Claim

 The hospital argues that the Secretary's interpretation of the offset rule essentially constituted the promulgation of a new substantive rule which was adopted without adherence to the required rulemaking procedures of the Administrative Procedure Act. 5 U.S.C. § 553.[13] We find this contention to be completely without merit.

---

**12.** Mr. Purdy testified:

> Q. Did you and the members of your profession who are actively in Medicare accounting have any reason in 1971 to believe that the position of the Medicare Bureau was that the interest on these funds was going to offset from interest expense on bonds?
>
> A. No. For one thing the bond issues were very much in their infancy. I don't have any recollections of ever having to discuss this issue with anybody. I did not work on the Cheshire engagement in '71, but I did do the Rutland Hospital financing in '71. At that time there was never any discussion about whether that income was an offset or not.

**13.** The rulemaking provisions of 5 U.S.C. § 553 do not apply to matters relating to benefits or contracts. 5 U.S.C. § 553(a)(2). Several courts have held that this exception makes notice and comment rulemaking unnecessary for regulations governing the amount of reimbursement available under Medicare. *See, e.g., Good Samaritan Hospital v. Mathews,* 609 F.2d 949, 953–54 (9th Cir. 1979); *Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1083 (D.C.Cir.1978). However, the Secretary has waived the so-called "benefits exception", *see* 36 Fed.Reg. 2532 (1971), for regulations adopted after 1971, so we must still determine whether applicable procedures were violated in the adoption of the post-1971 interpretation of the offset rule which is at issue here.

It is undisputed that the challenged interpretation was adopted by the Secretary in the course of the administrative adjudication of the Rutland Hospital case.[14] *See* Provider Appeal Decision (Blue Cross Ass'n), No. 00–78–17, [1979] Medicare & Medicaid Guide (CCH), § 29,717 (June 1979), *modified,* [1979–2] Medicare & Medicaid Guide (CCH) § 29,996 (Sept. 28, 1978). The Secretary has broad discretion under the Administrative Procedure Act to formulate interpretations of his regulations through the process of adjudication rather than rulemaking. *N. L. R. B. v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974). In the case at bar the Secretary chose to develop an interpretation of the offset rule which is completely consistent with the Medicare statute and regulations through the use of administrative adjudication. This decision was not an abuse of discretion.

The hospital also argues that the Secretary violated the Administrative Procedure Act by failing to publish his interpretation of the offset rule in the Federal Register. We believe that such publication was not required. The Administrative Procedure Act requires publication in the Federal Register of "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). However, the Act also provides that an agency need only make available for public inspection and copying "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases." 5 U.S.C. § 552(a)(2)(A). Courts which have been forced to harmonize these two provisions have held that an agency may formulate interpretations of general applicability in the course of issuing adjudicatory opinions without publishing such opinions in the Federal Register. *Nicholson v. Brown,* 599 F.2d 639, 648 (5th Cir. 1979); *Mehta v. Immigration & Naturalization Service,* 574 F.2d 701, 705 (2d Cir. 1978). The agency need only make such opinions available to the public as provided for by 5 U.S.C. § 552(a)(2)(A).

Professor Davis agrees with this reading of the Act, noting that a requirement of publication for all adjudicatory opinions which formulate interpretations of general applicability "would be so impractical that Congress could not have intended it." 1 K. Davis, Administrative Law Treatise, § 5:11 at 346 (2d ed. 1978). *See Nason v. Kennebec County CETA,* 646 F.2d 10, 19 (1st Cir. 1981) ("Enormous difficulties would be created if every interpretive or policy statement of an agency had to be published."). In the case at bar, the Secretary formulated his interpretation of the offset rule in the context of an adjudicatory opinion which was made available to the public pursuant to 5 U.S.C. § 552(a)(2)(A). We therefore find no violation of the Administrative Procedure Act.

## V. Exceptions to the Offset Rule

The hospital's final argument is that the Secretary erred when he refused to exempt from offset income earned on DSRF funds under two of the exceptions to the offset rule that are provided for by regulation. Medicare regulations provide that investment income will not be used to offset allowable interest expense if the "income is from gifts and grants, whether restricted or unrestricted, and which are held separate

---

**14.** Cheshire appears to suggest that the Secretary's interpretation of the offset rule was promulgated in a letter from M. F. Splitgerber to the fiscal intermediary dated May 9, 1979. Cheshire argues that this letter was in fact a legislative rule which could not be issued without compliance with the notice and comment rulemaking provisions of 5 U.S.C. § 553. However, close reading of the so-called Splitgerber letter reveals that the letter merely restated the policy of the Secretary, which had been developed in an earlier adjudicatory proceeding, that income earned on bond sinking funds was investment income within the meaning of the offset rule. The only change in policy announced was that bond sinking funds could qualify as funded depreciation provided that they were used for payment of bond principal or for asset maintenance and replacement, and the other criteria established by the Provider Reimbursement Manual were satisfied.

and not commingled with other funds" or if the income is earned on "funded depreciation". 42 C.F.R. § 405.419(b)(2)(iii). Cheshire claims that income earned on its DSRF should be exempt under either the gifts and grants exception or the funded depreciation exception. Each exception will be considered in turn.

### A. Gifts and Grants

 The hospital appears to concede that the funds in the DSRF do not come within the literal meaning of the gifts and grants exception of the offset rule. This is because the funds in the DSRF consist of proceeds from the 1971 sale of bonds rather than gifts and grants. The hospital points out, however, that when it financed the construction of its new hospital facility, it had available $1,100,000 in gifts and grants which it deposited in the fund which was used to construct the new facility. The hospital argues that it just as easily could have used $880,000 of these gifts and grants to establish the DSRF, and used the bond proceeds in their entirety for construction purposes. Because of this, the hospital contends that its contribution to the construction fund should be traced or imputed to the DSRF. To do otherwise, it claims, would exalt form over substance by making enormous financial consequences turn on the formal language of bond instruments.

The Secretary has expressly decided not to permit investment funds from non-gift sources to be traced to gifts and grants which are used for other purposes. The regulation specifically states that the gifts and grants exception applies only to funds which are held separate and not commingled with other funds. Given the potential administrative burden which a tracing requirement would entail, we cannot say that this decision of the Secretary is arbitrary, capricious, or an abuse of discretion. *Cf. Homan & Crimen, Inc. v. Harris*, 626 F.2d 1201, 1211 (5th Cir. 1980) (reasonable for Secretary to distinguish between stock purchases and asset purchases because of administrative burdens created by the former). We therefore uphold the Secretary's determination.

### B. Funded Depreciation

Cheshire also argues that the income earned on DSRF funds is exempt from offset because the DSRF qualifies as funded depreciation. The regulations concerning funded depreciation provide as follows:

*Funding of depreciation.* Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for replacement of depreciable assets, and coordinate their planning of capital expenditures with areawide planning activities of community and State agencies. As an incentive for funding, investment income on funded depreciation will not be treated as a reduction of allowable interest expense. 42 C.F.R. § 405.415(e).

The Secretary argues that Cheshire's DSRF does not qualify as funded depreciation for two reasons. First, he claims that the DSRF was established to provide security for bondholders, not to conserve funds for the replacement of depreciable assets as is required by the regulation. It is clear, however, that the DSRF funds are to be used to repay principal on a loan which was obtained for the purpose of acquiring new assets. A long line of decisions by the PRRB, several of which have been affirmed by the Health Care Finance Administrator (HCFA), hold that funds which are used for this purpose qualify as funded depreciation. *See, e.g., The Good Samaritan Hospital v. Blue Cross Ass'n*, [1980] Medicare & Medicaid Guide (CCH) § 30,338 at 9224 (PRRB Hearing Dec. No. 79–D80 Nov. 26, 1979); *Research Medical Center v. Blue Cross Ass'n*, [1978] Medicare & Medicaid Guide (CCH) § 29,230 at 10,467–68 (PRRB Hearing Dec. No. 78–D57 Jul. 28, 1978), *aff'd* [1979–1] Medicare & Medicaid Guide (CCH) § 29,447 at 9,273 (HCFA Dec. Sept. 28, 1978); *Albany Medical Center Hospital v. Blue Cross Ass'n*, [1978] Medicare & Medicaid Guide (CCH) § 29,215 at 10,370 (PRRB Hearing Dec. No. 78–D43 June 16, 1978), *aff'd,* [1978] Medicare & Medicaid Guide

(CCH) § 29,242 at 10,520 (HCFA Dec. Aug. 15, 1978). The record also contains a letter from M. F. Splitgerber of the Medicare Bureau which states that current Medicare policy is to treat bond sinking funds (same as DSRF) as funded depreciation if the funds are used to repay bond principal or for asset maintenance and replacement, provided that the remaining requirements of funded depreciation are satisfied. It thus seems clear that the defendants' first argument is contrary to the reasonable interpretation of the regulations which has been adopted by the PRRB, the Health Care Finance Administrator, and the Medicare Bureau. In light of this, we reject defendants' first contention.

■ Defendants also contend that the DSRF does not qualify as funded depreciation because it was established with borrowed funds. This is consistent with the Secretary's decision in *Albany Medical Center v. Blue Cross Ass'n, supra,* which held that a provider's debt service reserve account did not qualify for treatment as funded depreciation because it had been created with borrowed funds. The Secretary's determination in this regard appears to be a reasonable interpretation of the regulations. The regulation defining funded depreciation describes it as a means of conserving funds for the replacement of depreciable assets, suggesting that funded depreciation is to be financed by conserving operating revenues rather than through borrowing. The regulatory history of the regulation also supports this interpretation. The regulation in question was adopted pursuant to a suggestion made by the Health Insurance Benefits Advisory Council. The minutes of the Council's meetings indicate that one of the main reasons the Council decided to encourage funded depreciation was to obviate the need for providers to borrow funds for replacing depreciable assets, thereby reducing the amount of interest expense which would have to be reimbursed by Medicare. *See* HCFA Dec.

No. 77–D10, [1977]· Medicare & Medicaid Guide (CCH) § 28,422 at 9497 (Apr. 6, 1977) (summarizing regulatory history). This purpose would obviously be thwarted if providers were permitted to borrow in order to finance funded depreciation.

■ Having found that the Secretary's interpretation of the regulation is reasonable and conforms to the language and purpose of the regulation, we would normally affirm. However, this case presents a special problem because in several recent cases the PRRB has now adopted a different approach in seeking to discourage providers from borrowing funds to finance funded depreciation accounts. *See Ravenswood Hospital Medical Center v. Blue Cross Ass'n,* [1982] Medicare & Medicaid Guide (CCH) § 31,945 at 9608–09 (PRRB Dec. No. 82–D79 Apr. 7, 1982); *Norton Community Hospital v. Blue Cross Ass'n,* [1981–2] Medicare & Medicaid Guide (CCH) § 31,704 (PRRB Dec. No. 82–D40 Jan. 25, 1982). In these decisions the PRRB has held that funded depreciation accounts which are created with the proceeds of borrowing may qualify for treatment as funded depreciation, and are therefore exempt from application of the offset rule. However, pursuant to § 226.5 of the Provider Reimbursement Manual (PRM),[15] the interest expense incurred on the loans used to fund the accounts is not an allowable cost for which reimbursement is authorized.

This second anti-borrowing rule also appears to be consistent with the language and purpose of the Medicare regulations. 42 C.F.R. § 405.419(b)(2)(i) states that loans which result in investments are not considered necessary for Medicare purposes, and the interest paid on such loans is therefore not a reimbursable cost. Since funded depreciation accounts may be reasonably considered as investments, albeit investments with the limited purpose of replacing depreciable assets, a rule which disallows interest reimbursement on loans used to finance these accounts would appear to be a

---

15. Provider Reimbursement Manual § 226.5 states that, "When a provider borrows money to make deposits of funded depreciation, interest paid by the provider on money borrowed for this purpose is not allowable as cost."

reasonable interpretation of the regulation. Moreover, application of this second anti-borrowing rule would serve the regulations' purpose of discouraging borrowing for funded depreciation as readily as the anti-borrowing rule applied in *Albany Medical Center* and the case at bar.

 We thus are confronted with two anti-borrowing rules. One rule provides that interest paid on a loan which is used to establish a funded depreciation account will be reimbursed by Medicare, but the income earned on the funded depreciation account will then be used to offset the provider's overall interest expense. The other rule conversely provides that income earned on a funded depreciation account which is created with borrowed funds will be exempt from the offset rule, but the interest paid on these borrowed funds will not be reimbursed by Medicare. Both of these rules appear to be consistent with the language and purpose of the regulations. It is clear, however, that both rules cannot be applied in the same case without imposing an unwarranted double penalty on providers who borrow to finance funded depreciation.[16] It is equally clear that the PRRB cannot be permitted to apply one anti-borrowing rule in some cases, and a different anti-borrowing rule in other cases without acknowledging or explaining the inconsistency. Such an approach is clearly arbitrary and capricious. *See Hatch v. Federal Energy Regulatory Commission,* 654 F.2d 825, 834 (D.C.Cir.1981) (agency must provide reasoned explanation for its departure from past precedents). The choice of which anti-borrowing rule to adopt, however, is one that should be made by the agency. We, therefore, order a remand to the Secretary on this point with the direction that he clarify which of the two anti-borrowing rules will be applied in cases of this sort.[17]

Cheshire makes one final argument which requires brief discussion. Cheshire contends that neither anti-borrowing rule should be applied in this case, because Cheshire contributed $1,700,000 of its own money to the construction fund, whereas it could just as easily have made this contribution to the DSRF without altering the substance of the financing transaction. Cheshire renews its contention that its contribution should therefore be traced or imputed to the DSRF so as to make any anti-borrowing rule inapplicable. The Secretary declined, however, to resort to the tracing of funds, and we cannot say that his rejection of this speculative and administratively burdensome procedure was an abuse of discretion.

We find that the district court was substantially correct in determining that the administrative decision in this matter was not arbitrary, capricious, an abuse of discretion, or unauthorized by law. A limited remand, however, is required for reconsideration of the proper application of the anti-borrowing rule.

Vacated and remanded to the district court with instructions to remand to the Secretary for further proceedings not inconsistent with this opinion.

**16.** The Secretary could not have refused to reimburse Cheshire for Medicare's share of the interest expense associated with the borrowed funds used to establish the DSRF, and also applied the offset rule to reduce Cheshire's other interest expense by the amount of income earned on funds in the DSRF. Such an approach would be clearly inconsistent with the offset rule's purpose of limiting provider reimbursement to necessary costs which are actually incurred.

**17.** If the Secretary determines that the DSRF may qualify as funded depreciation notwithstanding the fact that it was created with borrowed funds, he may then consider the defendants' further contention that the full amount of the DSRF should not be treated as funded depreciation because the amount of money in the fund greatly exceeds Cheshire's total accumulated depreciation.