**SACRED HEART HOSPITAL,**
Muhlenberg Medical Center
and Easton Hospital

v.

**Margaret M. HECKLER, Secretary of
Health and Human Services.**

**Civ. A. No. 84–336.**

United States District Court,
E.D. Pennsylvania.

Oct. 9, 1984.

Frederick J. Lanshe, Allentown, Pa., for plaintiffs.

Steven J. Engelmyer, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiffs Sacred Heart Hospital, Muhlenberg Hospital and Easton Hospital (Hospitals) are non-profit, short term, acute care hospitals in Pennsylvania which are certified to participate in the Medicare program as "providers" of hospital care to Medicare beneficiaries, the national health insurance program for the elderly. Under

Part A of the Medicare program, plaintiffs are entitled to reimbursement of their reasonable costs incurred in providing these services. 42 U.S.C. § 1395f(b). This case arose out of a dispute between plaintiffs and their designated fiscal intermediary, Blue Cross of Lehigh Valley, over plaintiff's cost reports for their fiscal years ending 1979, 1980, and 1981.

The basic facts pertaining to these cost reports are not in dispute. During the past decade, each of the plaintiffs undertook capital construction projects directly related to their provision of patient care. To finance the projects, each plaintiff arranged tax-exempt financing through its local bonding authority. In each case, the hospital was required to establish a debt service reserve fund (DSFR) as protection for the bondholders. As required by the Trust Indentures, each DSFR was invested and earned a return.

In performing audits on the cost reports at issue, the intermediary offset the income earned by the DSFRs against plaintiffs' otherwise allowable interest expenses. Under the Medicare regulations, providers are entitled to reimbursement for necessary and proper interest on both current and capital indebtedness. 42 C.F.R. § 405.-419(a). Plaintiffs are now contesting this action by the intermediary. Blue Cross, the intermediary, stated that the basis for the challenged adjustments was the offset rule which requires that interest expenses "be reduced by investment income except where such income is from gifts and grants, whether restricted or unrestricted, and which are held separate and not commingled with other funds. Income from funded depreciation or a provider's qualified pension fund is not used to reduce interest expense." 42 C.F.R. § 405.419(o)(3). Blue Cross stated its belief that the DSFRs do not qualify as funded depreciation.

Upon appeal of the plaintiffs, the Provider Reimbursement Review Board (PRRB) found that the DSFRs do not qualify as funded depreciation thereby affirming the intermediary's actions. Following receipt of the PRRB's decision, the Hospitals petitioned the Deputy Administrator of the Health Care Financing Administration, the Secretary's delegate under 42 U.S.C. § 1395oo(f), to reverse the PRRB's decision on the grounds that it was at odds with prior PRRB and Secretarial decisions on the issue and was unsupported by the regulations. The Deputy Administrator, on November 17, 1983, affirmed the decision of the PRRB; this decision is the final administrative decision of the Secretary. 42 U.S.C. § 1395oo(f).

Plaintiffs contend that the Secretary's final decision should be reversed because it is contrary to governing regulation and the Secretary's established previous policy and is, therefore, arbitrary and capricious. Defendant maintains that the Medicare cost principles require her to limit the amount of plaintiffs' reimbursement to the actual or net cost of such borrowing less any benefit derived therefrom.

Before me now are the parties' cross-motions for summary judgment.

■■■ Plaintiffs' principal contention is that the Secretary erred when she concluded that the interest expenses plaintiffs incurred during their capital construction projects had to be offset by the interest earned by the debt service reserve funds. When examining plaintiffs' contentions, it is necessary to keep in mind the limited scope of review of administrative decisions provided by statute. The federal courts are authorized to set aside agency findings, conclusions, and actions only if they are:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law; or

(E) unsupported by substantial evidence.

5 U.S.C. § 706. While a reviewing court cannot totally abdicate its responsibility to

the administrative agency, it is generally agreed that courts should afford considerable deference to the agency's interpretation of its regulations. *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service,* 689 F.2d 1112, 1117 (1st Cir.1982); *Psychiatric Institute of Washington, D.C., Inc. v. Schweiker,* 669 F.2d 812, 813 (D.C.Cir.1981).[1] Plaintiff cites several cases for the contention that federal courts owe little deference to an agency's unofficial interpretation of a regulation. However, in each of these cases, the court simply noted that it would be inappropriate for the court to defer absolutely to the interpretation made by an agency, *i.e.,* "interpretative rulemaking is not controlling upon the courts," but that agency interpretations were certainly a source of guidance to which the court should give deference. How much deference is due to an interpretation depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Daughters of Miriam Ctr. for the Aged v. Mathews,* 590 F.2d 1250, 1258 (3d Cir.1978), *citing, Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). A reviewing court, moreover, must determine whether the agency's interpretation is consistent with the language of the regulation and with the purpose the regulation is intended to serve. *Cheshire Hospital, supra,* at 1117. These guidelines merely restate the statutory standard of review set forth in 5 U.S.C. § 706.

■ With these guidelines in mind it is now possible to turn to the merits of the parties' contentions. Plaintiffs' first argument is that the offset against a "necessary and proper" interest expense is not necessary because the income earned by the DSRFs does not constitute investment income under 42 C.F.R. § 405.419(b)(iii).

Rather this income, plaintiffs contend, constitutes funded depreciation. Plaintiffs note that the DSRFs were limited to use in the event of default, or at maturity, to retire the bonds. In dismissing a similar argument, the court in *Cheshire Hospital, supra,* at 1118 noted that "[s]ince the interest earned on the DSRF will ultimately benefit [the plaintiff] we do not believe it is unreasonable to treat such interest as investment income of the hospital." This rationale applies equally to this case; each hospital will benefit financially from the income earned on the DSRFs either because it will prevent the hospitals from defaulting on their bond payments or will be used towards retiring the bonds upon maturity.

Plaintiffs also contend that the source of the funds in the DSRFs is irrelevant and therefore, it makes no difference that the funds in the DSRFs were derived from bond proceeds or were "borrowed" funds. The Secretary ruled that the DSRFs did not qualify as funded depreciation because they were established with borrowed funds. Central to plaintiffs' argument is the contention that the Secretary's decision in this case constitutes a reversal of the agency's longstanding interpretation of the regulation governing funded depreciation. In support of this contention, plaintiffs refer to a line of cases in which the PRRB and the Deputy Administrator, and therefore the Secretary, refused to offset interest income from a DSRF against interest expense on the grounds that the DSRFs qualified as funded depreciation.

After reviewing these prior decisions, it is clear that although the Secretary has frequently held that funds established to protect bondholders qualify as funded depreciation, the Secretary has consistently limited the amount of a provider's reimbursement to the actual or net cost of such borrowing less any benefit derived there-

---

**1.** Plaintiffs contend that the decision in *Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc.,* 689 F.2d 1112, 1117 (1st Cir. 1982) is neither binding upon this court nor persuasive for defendant's position. Plaintiffs are correct that this decision is not binding on me; nevertheless, I find the *Cheshire Hospital* court's analysis to be a carefully considered one and to be applicable to this case.

from. In other words, the Secretary has consistently held that providers are not entitled to both a reimbursement of interest expense attributable to a DSRF and an exemption from offsetting the investment income earned by the DSRF. Although the Secretary stated that the DSRFs were funded depreciation in the cases upon which plaintiffs rely, the Secretary also held that interest expense incurred on the loans used to fund the accounts is not an allowable cost for which reimbursement is required. In this case, the Secretary held that the interest paid on a loan attributable to the DSRFs was an allowable expense under 42 C.F.R. § 405.419, but these interest expenses had to be offset against the income the DSRFs earned.[2] The result in each instance is the same; the provider may only recover the net cost of borrowing.

As the court in *Cheshire Hospital, supra,* noted however, the Secretary may not be allowed to apply one rule in one case and another in a second case; the Secretary must adopt a consistent approach to the perceived problem. For this reason the court in *Cheshire Hospital, supra,* ordered a limited remand for the Secretary to clarify which of the two rules would be adopted for all cases of this type. In January 1983, the Secretary published her interpretation governing funded depreciation in which she adopted the position followed in this case, *i.e.* that interest paid on a loan which is used to establish a funded depreciation account will be reimbursed, but the income earned by the borrowed funds will be used to offset the interest expense. PRM Transmittal No. 279.

Plaintiffs contend nevertheless that the Secretary's decision is arbitrary and capricious because it is inconsistent with the

established policy that the source of funded depreciation is irrelevant. I do not find this to be the case. First, as made clear by the preceding discussion, the Secretary has not suddenly shifted policies; rather, she has tried to effectuate the same policy, *i.e.* minimizing the need for borrowed funds and thereby reducing the amount of interest expense which have to be reimbursed by Medicare, by two different rules. The Secretary has now clearly adopted the one applied in this case.

Moreover, the Secretary's determination that a DSRF created with borrowed funds does not qualify as funded depreciation is reasonable and adheres to the language and policy underlying funded depreciation. The regulation defining funded depreciation describes it "as a means of conserving funds for replacement of depreciable assets." 42 C.F.R. § 405.415(e). As the court in *Cheshire Hospital, supra,* at 1125, noted, this suggests that depreciation is to be funded by conserving internal, operating funds rather than by borrowing, in order to reduce the amount of interest expense which should have to be reimbursed by Medicare. If the Secretary were to allow the providers to benefit from the interest earned on the DSRFs at the same time they are reimbursed for the interest expense incurred by funding the DSRFs, the Secretary would create an incentive in favor of borrowing when exactly the opposite is the desired result. Therefore, I believe the Secretary's rule is consistent with her stated policy and not arbitrary and capricious.

 In a related argument, plaintiffs contend that the Secretary's decision constitutes a substantive change in medicare policy which was adopted without adherence to the requirements of the Adminis-

---

**2.** There have been several decisions in which the Secretary has held that a provider's DSRF will not qualify as funded depreciation because it has been created with borrowed funds; therefore, there has not been the dramatic reversal in position that plaintiffs would lead me to believe. *See, Albany Medical Center Hospital v. Blue Cross Ass'n.,* [1978] *Medicare & Medicaid Guide* (CCH) § 29,215 at 10,370 (PRRB Hearing Dec. No. 78–D43 June 16, 1978), *aff'd* [1978] *Medi-*

*care & Medicaid Guide* (CCH) § 19,242 at 10,520 (HCFA Dec. Aug. 15, 1978); [1977] *Medicare & Medicaid Guide* (CCH) § 28,520 at 9845 (PRRB Hearing Dec., No. 77–D40 June 10, 1977), *aff'd* [1977] *Medicare & Medicaid Guide* (CCH) § 28,-600 at 10,084 (HCFA Dec. Aug 7, 1977). ("Money cannot be borrowed to make deposits into the funded depreciation account." § 28,520 at 9850).

trative Procedure Act, 5 U.S.C. § 553. Under the Act, new substantive rules must be promulgated and published before they can become effective. Exception is made for "interpretative rules" which are "statements as to what the administrative officer thinks the statute or regulation means." *Gibson Wine Co. v. Snyder,* 194 F.2d 329, 331 (D.C.Cir.1952). Applying this definition, I find that the Secretary's decision in this case does not constitute a substantive change. Not only has the Secretary applied the rule in other cases but also the rule constitutes an interpretation of one of her regulations. While it is preferable that the Secretary publish such interpretations, it is not an abuse of discretion for her to develop an interpretation of the offset regulation which is completely consistent with the Medicare statute and regulations through administrative adjudication. *Cheshire Hospital, supra,* at 1123.

Finally, plaintiffs argue that the Secretary's new interpretation exalts form over substance because the hospitals could have used their own resources to fund the DSRFs and used the borrowed funds to cover "upfront" costs such as feasibility studies. The Deputy Administrator, however, found that plaintiffs would not have been able to avoid the result reached by the Board because to borrow for "upfront" costs when they had adequate internal funds would have constituted unnecessary borrowing and would have rendered "the interest expense on the borrowed funds not allowable under 42 C.F.R. § 405.419." (R. 5). Plaintiffs fail to respond directly, in their brief, to the Deputy Administrator's finding, and I do not find his rejection of the "form over substance" argument to be an abuse of discretion. Similarly, in *Cheshire Hospital, supra,* at 1121, the court, rejecting plaintiff's argument that the anti-borrowing rule should not apply because plaintiff could have used its own funds to establish the DSRF, noted that the Secretary's refusal to resort to the tracing of funds was not an abuse of discretion.

Because the Secretary has now adopted a consistent approach which I do not find to be arbitrary, capricious, an abuse of discretion or unauthorized by law, the plaintiffs' position necessarily fails.