760 F.2d 771
 9 Soc.Sec.Rep.Ser. 269, Medicare&Medicaid Gu 34,581
MEMORIAL HOSPITAL OF CARBONDALE and Herrin Hospital,
Plaintiffs-Appellants,
v.
Margaret M. HECKLER, Secretary of the Department of Health
and Human Services, and Carolyne K. Davis,
Administrator, Health Care Financing
Administration, Defendants-Appellees.
 No. 83-3040.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 5, 1984.
Decided April 18, 1985.
Order on Denial of Rehearing June 11, 1985.
 
 Ronald N. Sutter, Powers, Plyes, Sutter & O'Hare, Washington, D.C., for plaintiffs-appellants.
 Vicki L. Schulkin, Dept. of Health & Human Services, Washington, D.C., for defendants-appellees.
 Before BAUER and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*
 FLAUM, Circuit Judge.
 
 
 1
 Plaintiffs-appellants Memorial Hospital of Carbondale ("Memorial") and Herrin Hospital ("Herrin") are not-for-profit hospitals owned and operated by Southern Illinois Hospital Services ("SIHS"), a not-for-profit Illinois corporation. Both hospitals are qualified health care providers under Title XVIII of the Social Security Act, 42 U.S.C. Secs. 1395 et seq. (1982) (the "Medicare Act"). Memorial and Herrin brought this action in the district court seeking review of the defendants' (collectively referred to as the "Secretary") disallowance of Medicare reimbursement for several categories of costs. Both hospitals contested, among other things, the Secretary's decision to disallow the interest paid on money borrowed to establish a bond reserve fund. In addition, Memorial objected to the Secretary's decision to offset against allowable education costs the family practice grant funds received by Memorial from the Public Health Service. Following the magistrate's[1] grant of summary judgment to the Secretary on these two issues, the hospitals appealed. We now affirm in part and reverse in part.
 
 I. BACKGROUND
 
 2
 The Medicare Act provides that qualified providers of health care services to Medicare beneficiaries will be reimbursed for the lesser of the "reasonable cost" of those services or their "customary charges" with respect to those services. 42 U.S.C. Sec. 1395f(b)(1) (1982).[2] "Reasonable cost" is very broadly defined by the Act, to be defined more specifically in regulations promulgated by the Secretary. 42 U.S.C. Sec. 1395x(v)(1)(A) (1982). In addition to these regulations, the Secretary issues the Provider Reimbursement Manual ("PRM") to give guidance in interpreting the regulations. This case involves a challenge to the Secretary's interpretation and application of various provisions in the regulations and PRM.
 
 
 3
 Providers are normally reimbursed under Medicare through private organizations (usually insurance companies) acting as "fiscal intermediaries," under contract with the Secretary. See 42 U.S.C. Sec. 1395h (1982). The intermediaries determine the amount of reimbursement due to a provider based on the cost report submitted by the provider at the close of each fiscal year. See 42 C.F.R. Secs. 405.406(b), 405.453(f) (1984). If a provider disagrees with its intermediary's reimbursement determination, it may obtain review by the Provider Reimbursement Review Board ("PRRB" or the "Board") if the amount in controversy is $10,000 or more. 42 U.S.C. Sec. 1395oo(a) (1982); 42 C.F.R. Sec. 405.1835 (1984). The Board has the authority to "affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report," and may consider issues and evidence not considered by the intermediary in making its final determination. 42 U.S.C. Sec. 1395oo(d) (1982). The Board's decision constitutes final agency action unless, within sixty days after the provider is notified of the Board's decision, the Secretary reverses, affirms, or modifies the Board's decision on her own motion. 42 U.S.C. Sec. 1395oo(f)(1) (1982). The Secretary has delegated this power to the Administrator of the Health Care Financing Administration ("HCFA"), who has redelegated the authority to the Deputy Administrator. See Indiana Hospital Ass'n, Inc. v. Schweiker, 544 F.Supp. 1167, 1177-78 (S.D.Ind.1982) (upholding validity of these delegations), aff'd, 714 F.2d 872 (7th Cir.1983) (per curiam), cert. denied, --- U.S. ----, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). A provider may obtain judicial review of "any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary...." 42 U.S.C. Sec. 1395oo(f)(1).
 
 
 4
 Memorial and Herrin filed timely appeals with the Board to contest their intermediary's disallowance of seven items of costs for cost years ending March 31, 1977, 1978, 1979, and 1980. Only two of those items, the offset of Memorial's family practice grant against allowable educational costs and the disallowance of interest on the hospitals' bond reserve fund, are presented in this appeal. The Board conducted a hearing on October 6, 1981, and in a 2-1 decision dated April 6, 1982, upheld the intermediary's determination to offset Memorial's family practice grant and modified the intermediary's decision with respect to interest on the bond reserve fund. PRRB Decision No. 82-D77, 1982 Medicare & Medicaid Guide (CCH) p 31,944, at 9603-04. The Deputy Administrator of the HCFA, acting as the Secretary's delegate, affirmed the Board's disposition of these issues on June 2, 1982. HCFA Deputy Administrator Decision, 1982 Medicare & Medicaid Guide (CCH) p 32,046, at 10,031-32. The hospitals then sought judicial review of this final administrative decision in the district court. After the parties consented to trial by magistrate, both sides filed motions for summary judgment. The magistrate granted the Secretary's motion for summary judgment on these two issues on September 21, 1983. This appeal followed.
 
 
 5
 Our scope of review on appeal is narrow, and we must defer to the Secretary's judgment unless her actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A) (1982). The presumption of regularity afforded the Secretary's decision under this standard does not, however, shield it from a "thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). With this in mind, we now address the issues presented in this appeal.
 
 II. FAMILY PRACTICE GRANT ISSUE
 A. Introduction
 
 6
 The Medicare regulations specify that a provider may be reimbursed for the "net cost" of "approved educational activities," 42 C.F.R. Sec. 405.421(a) (1984), including training programs for interns and residents. Id. Sec. 405.421(c). For the cost years at issue in this case, net educational costs were determined by deducting from the cost of approved educational activities "any reimbursements from grants, tuition, and specific donations." 42 C.F.R. Sec. 405.421(b)(2) (1978). The regulation on grants and gifts similarly provided that while unrestricted grants did not have to be deducted to determine allowable costs, grants "designated by a donor for paying specific operating costs" were to be offset against operating costs in determining allowable costs. 42 C.F.R. Sec. 405.423 (1982).[3] The Provider Reimbursement Manual provided an exception to the offset requirement for "seed money" grants, defined as grants "designated for the development of new health care agencies or for expansion of services of established agencies...." PRM Sec. 612.2.
 
 
 7
 The Public Health Service ("PHS") received authorization from Congress in 1971, through an amendment to title VII of the Public Health Service Act, 42 U.S.C. Secs. 201 et seq. (1982), to make grants to hospitals to "plan, develop, and operate, or participate in, an approved professional training program ... in the field of family medicine...." Pub.L. No. 92-157, Sec. 107(b), 85 Stat. 457 (1971) (codified at 42 U.S.C. Sec. 295e-1). On February 13, 1974, Memorial applied for one of these family practice training grants. PHS approved a three-year grant on June 29, 1974, and Memorial's training program began the following month. Memorial received $131,893 and $64,254 in grant funds for its 1977 and 1978 fiscal years, respectively.
 
 
 8
 Memorial alleges that there was "considerable doubt within HEW whether the family practice grants should be offset against the cost of approved educational activities." See PRRB Decision No. 82-D77, 1982 Medicare & Medicaid Guide (CCH) p 31,944, at 9602. This confusion was highlighted by a sequence of events in the Atlanta regional office of the Department of Health, Education, and Welfare ("HEW") (predecessor agency to the Department of Health and Human Services) in 1975-76. On January 22, 1975, the Atlanta office issued a letter to intermediaries within that region (not the region in which Memorial is located), instructing them to treat family practice grants as seed money grants exempt from offset under section 612.2 of the PRM. The letter was withdrawn in July 1976 by order of the Bureau of Health Insurance, which administered the Medicare program before the transfer of functions to the HCFA in 1977. Despite the inconsistent treatment of family practice grants within that region, however, and despite some internal debate over the proper position to adopt, the Department's consistent practice was to require the deduction of family practice grants in determining allowable educational costs.
 
 
 9
 On April 8, 1977, Congressman Paul Rogers, who was Chairman of the Subcommittee on Health and the Environment of the Committee on Interstate and Foreign Commerce (the subcommittee with jurisdiction over Public Health Service legislation), wrote to HEW Secretary Califano asking him to reconsider the Department's policy of offsetting family practice grants on the basis that it was undermining federal and state efforts to encourage family practice training programs. He stated that "[t]o require monies received from primary care training be deducted is, in large measure, negating the action of the Congress and State legislatures in appropriating monies for such training." In a response to Congressman Rogers dated January 18, 1978, Califano stated that family practice grants were "restricted grants" subject to offset under 42 C.F.R. Secs. 405.421 and 405.423, and that they should have been treated as such by the Atlanta regional office. Califano further stated, however, that in order to support Congress's and the Administration's priority of encouraging more doctors to become primary care physicians, the Department intended to propose appropriate modifications to its existing regulations in order to exempt family practice grants from the offset requirement.
 
 
 10
 On August 10, 1979, the Secretary proposed these modifications in a notice of proposed rulemaking. 44 Fed.Reg. 47,117 (Aug. 10, 1979). A final rule was issued nearly a year later. 45 Fed.Reg. 51,783 (Aug. 5, 1980). The rule amended 42 C.F.R. Sec. 405.421 by revising and redesignating subsection (b)(2), the general offset provision, as subsection (g)(1), and adding a new subsection (g)(2) which provided that "[e]ffective for cost reporting periods beginning on or after January 1, 1978, grants and donations that the donor has designated for internship and residency programs in family medicine, general internal medicine, or general pediatrics are not deducted in calculating net costs." 45 Fed.Reg. at 51,787. Because the family practice grant exception to the general offset requirement was only made retroactive to cost years beginning on or after January 1, 1978, however, the family practice grant monies received by Memorial in its cost reporting periods ending March 31, 1977 and 1978 (cost years 1977 and 1978) are subject to the previously existing requirements.
 
 
 11
 Memorial's intermediary offset Memorial's family practice grant funds in determining allowable educational costs. Memorial appealed to the Board, arguing that its family practice grant was exempt from offset either as a seed money grant under section 612.2 of the PRM or as a "last dollar" grant in accordance with longstanding agency policy. Memorial also asserted that if the former regulation required offset of family practice grants, it was contrary to the statute authorizing such grants (the Public Health Service Act) and therefore invalid. The Board affirmed the intermediary's determination, holding that the family practice grants were neither seed money grants nor last dollar grants. The Deputy Administrator of the HCFA affirmed the Board's decision without further discussion. The magistrate upheld the agency's actions after also finding that family practice grants were neither seed money grants nor last dollar grants and that their offset was not contrary to statute.
 
 B. Discussion
 
 12
 Memorial's contention that family practice grants qualify as seed money grants, and are thus exempt from offset, is based on section 612.2 of the Provider Reimbursement Manual, which provides:
 
 
 13
 Grants designated for the development of new health care agencies or for expansion of services of established agencies are generally referred to as "seed money" grants. "Seed money" grants are not deducted from costs in computing allowable costs. These grants are usually made to cover specific operating costs or group of costs for services for a stated period of time. During this time, the provider will develop sufficient patient caseloads to enable continued self-sustaining operation with funds received from Medicare reimbursement as well as from funds received from other patients or other third-party payers.
 
 
 14
 This section describes three essential characteristics of a seed money grant: (1) the grant is designated for the development or expansion of a health care agency, (2) the grant is made to cover specific operating costs for a stated period of time, and (3) the provider will become self-sustaining by the end of that period. Memorial contends that family practice grants exhibit each of these three characteristics.
 
 
 15
 Memorial argues that its family practice grant displays the first feature of a seed money grant because it was designated for the development of the hospital's Family Practice Center, which Memorial argues qualifies as either a new health care agency or an expansion of services of an established agency. The Center was constructed specifically to house Memorial's family practice training program. The facilities occupied a two-story wing of the hospital, including two treatment rooms, twelve examining rooms, twelve consultation rooms for residents, and nurses' stations. Memorial's grant application contemplated that because of the program's emphasis on training through actual patient care, the Center would "provide comprehensive primary care for approximately 5% of the families of the Carbondale area."
 
 
 16
 Memorial asserts that its grant demonstrates the second characteristic of a seed money grant because it was made to cover costs for a three-year period beginning July 1, 1974, and ending June 30, 1977. The last characteristic is present, according to Memorial, because the training program was expected to become nondependent on federal funds by the end of that period. The PHS regulations then in effect provided that "[t]he ability to continue the project on a self-sustaining basis" was one of the factors to be considered by the Secretary in awarding a family practice grant. 42 C.F.R. Sec. 57.1605(a)(4) (1974). The PHS booklet describing the grants emphasized that "[t]hese grants are to meet an acceptable objective within a definite period of time rather than providing long term, continuing support of ongoing programs." Memorial's grant application expressly stated its expectation that non-federal funds would be available to support the program after the grant terminated.
 
 
 17
 The Secretary defends the agency's decision not to classify family practice grants as seed money grants not so much by disagreeing with the contentions made by Memorial (although she does disagree with Memorial's assertion that the third characteristic exists[4]), as by pointing out a distinction Memorial failed to make. The Secretary asserts that section 612.2 has consistently been interpreted by the agency to apply only to grants for services, rather than to training grants, and that family practice grants are training grants not covered by section 612.2.[5]
 
 
 18
 Memorial disputes the Secretary's classification of family practice grants as training grants, arguing that training and the provision of services are not mutually exclusive and that family practice grants fulfill both needs. It cites as support for this position the health care services provided to the community through the Family Practice Center and the letter sent out by the Atlanta regional office informing intermediaries that family practice grants were to be treated as seed money grants because the grants were "made for the purpose of extending services." This letter was withdrawn, however, after Medicare's central office instructed the regional office that the seed money exception did not apply to family practice training grants.
 
 
 19
 The Secretary finds support for her position that family practice grants are training grants rather than grants for the provision of services in the statute authorizing the grants. The title of the act authorizing family practice grants was the "Comprehensive Health Manpower Training Act of 1971." Pub.L. No. 92-157, 85 Stat. 431 (1971). The purpose of the act was "to amend title VII of the Public Health Service Act to provide increased manpower for the health professions, and for other purposes...." H.R.Rep. No. 258, 92d Cong., 1st Sess. 1 ("House Report"), reprinted in 1971 U.S.Code Cong. & Ad.News 1610. The statute created and authorized family practice grants by adding a new section 767 to the Public Health Service Act, headed: "Grants for training, traineeships, and fellowships in family medicine." Pub.L. No. 92-157, Sec. 107, 85 Stat. 457 (1971) (codified at 42 U.S.C. Sec. 295e-1). The legislative history of the 1971 statute reveals that Congress created family practice grants specifically to train more family physicians, in an attempt to slow or reverse the trend away from the general practice of medicine and into specialties. House Report at 25-26, reprinted in 1971 U.S.Code Cong. & Ad.News 1625-26. The Committee specifically provided that at least 75% of family practice grant funds "shall be for the support of the students, interns, residents, and other health professionals to encourage and assist them to receive such training." House Report at 26, reprinted in 1971 U.S.Code Cong. & Ad.News 1626.
 
 
 20
 Memorial's own grant application provides additional support for the Secretary's position that family practice grants are training grants rather than grants for the provision of services. The application form is headed "Training Grant Application," and requires a detailed description of Memorial's proposed training program. Memorial's application provided this summary of its program:
 
 
 21
 The purpose of the program is to produce primary care physician manpower for areas of need in Southern Illinois through specialty training in Family Medicine.
 
 
 22
 Important characteristics of the program are three years of training in an approved Family Practice residency, sponsored jointly by a community hospital and a new three-year medical school, emphasizing the provision of family and community-oriented comprehensive and continuing patient care by teams of physicians, nurse clinicians, nurses, psychologists, social workers, nutritionists, health educators, etc. The training experience is planned to simulate as closely as is possible the anticipated conditions of the delivery of comprehensive health care by such teams of health professionals, with strong emphasis on health maintenance through health education and prevention of illness.
 
 
 23
 It appears from the above excerpt and the legislative history of family practice grants that the primary purpose of the grants is to train physicians in family practice medicine. Memorial's emphasis on the provision of health care services to the community is really an emphasis on the quality of the training experience that its trainees will receive--an experience "planned to simulate as closely as is possible" the actual practice of family medicine in the community. Although an incidental benefit of Memorial's family practice training program was undoubtedly the furnishing to the community of some services that had not previously been provided, the primary purpose of the program was to train primary care physicians for the southern Illinois region.
 
 
 24
 Although we might be inclined to uphold the Secretary's finding that family practice grants are not seed money grants under section 612.2 of the PRM if based on this service versus training grant distinction, however, it appears that this was not the basis for the agency's decision. Rather, the PRRB held that family practice grants did not meet the criteria for seed money grants because
 
 
 25
 [s]eed money grants as addressed in Section 612 of [the PRM] concerns [sic] only developing new home health agencies or expanding the services of established agencies. Seed money provides for the establishment of a new state of art (home health care) in patient care. It does not relate to the expansion of existing hospital or physician services.
 
 
 26
 PRRB Decision No. 82-D77, 1982 Medicare & Medicaid Guide (CCH) p 31,944, at 9604. A home health agency is a public or private organization which "is primarily engaged in providing skilled nursing services and other therapeutic services" on a visiting basis in a patient's home. 42 U.S.C. Sec. 1395x(m), (o) (1982). The Secretary now concedes that "the Board appears to have misconstrued" section 612.2 of the PRM:
 
 
 27
 The Board's reference to home health agencies appears to arise from section 612.3 of the Provider Reimbursement Manual, which describes the application of general grant rules to certain specific Public Health Service grants, not including family practice grants. That section specifies that certain grants received to assist States to develop new home health agencies would be considered seed money grants.
 
 
 28
 Brief of Appellee at 21 & n. 13. The Deputy Administrator affirmed the Board's decision to offset family practice grants against allowable educational costs without further discussion. Thus, the only ground for the agency's finding that Memorial's grant was not a seed money grant seems clearly erroneous and has expressly been disavowed by the Secretary on appeal.
 
 
 29
 Under these circumstances, we believe the magistrate erred in proceeding to affirm the agency's decision under a different theory, the training versus service grant distinction, rather than remanding to the agency. The Supreme Court's decision in SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), prohibits appellate courts from affirming an agency's decision on grounds other than those stated by the agency. Id. at 88, 63 S.Ct. at 459; Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co., 463 U.S. 29, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983); People of the State of Illinois v. Interstate Commerce Commission, 722 F.2d 1341, 1348 (7th Cir.1983). The rationale for this rule is that courts would then be making determinations of policy or judgment which the agency alone is authorized to make:
 
 
 30
 For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.
 
 
 31
 SEC v. Chenery Corp., 318 U.S. at 88, 63 S.Ct. at 459.
 
 
 32
 The Secretary urges us to disregard Chenery in this case because the issue essentially involves "legal conclusions" regarding the applicability of section 612.2. We believe, however, that the question of whether family practice grants qualify as seed money grants under that section is not so much a legal question as a question of agency policy. As Memorial points out, family practice grants arguably meet the literal requirements of section 612.2. Counsel for the Secretary on appeal argues that section 612.2 does not cover these grants because of a longstanding agency distinction between service and training grants in addition to an agency determination that family practice grants are training grants. This is precisely the sort of policy determination that must be made by the agency itself rather than by lawyers and judges on appeal. Although the Secretary's arguments on appeal sound reasonable to us, we are not absolutely convinced that the agency would embrace this position on remand. Cf. People of the State of Illinois v. Interstate Commerce Commission, 722 F.2d 1341, 1348 (7th Cir.1983) (futile to remand if sure that agency would reinstate its decision). We must therefore reverse the magistrate's decision insofar as it affirms the Secretary's determination under section 612.2 of the PRM, with instructions to remand this portion of the case back to the agency for further action.
 
 
 33
 Although the magistrate quite thoroughly addressed Memorial's last two contentions--that the family practice grants are exempt from offset as "last dollar" grants and that if offsetting the grants against educational costs is required by Medicare's regulations then those regulations are contrary to statute and therefore invalid--we do not address these issues in light of our disposition of the seed money grant question.
 
 III. BOND RESERVE FUND ISSUE
 A. Introduction
 
 34
 In 1978, the city of Carbondale, Illinois issued $9.5 million in tax-exempt revenue bonds under an agreement with Memorial and Herrin Hospitals. The agreement provided that the city would issue the bonds and lend the net proceeds of the bond issue to the hospitals, and that the hospitals would repay the loan plus scheduled interest at rates varying from 4.35% to 7.2%. Of the $9.5 million in proceeds, most was used by the hospitals to retire their outstanding indebtedness, on which they were then paying 8-10% interest.[6] Approximately $375,000 of the proceeds were used to pay for the costs of issuance and underwriters' discount. The remainder, $809,133, was used to establish a bond reserve fund, as required by the bond underwriters as a condition for issuing the bonds. The purpose of the reserve fund was to provide assurances to bondholders that payments would be made on the bond indebtedness. The fund was required to have a minimum balance "of not less than Maximum Annual Principal and Interest Requirements." The hospitals invested and earned interest income on the money in this bond reserve fund.
 
 
 35
 In their cost reports for cost years 1978-80, the hospitals claimed as an allowable Medicare cost all of the interest expense they incurred in connection with the 1978 bond issue, based on 42 C.F.R. Sec. 405.419(a) ("necessary and proper" interest expense is allowable cost). That regulation further provides that in calculating "necessary" interest expense, the allowable interest costs must be reduced by "investment income." Id. Sec. 405.419(b)(2)(iii). "Income from funded depreciation," however, "is not used to reduce interest expense." Id. "Funded depreciation" was defined by the Provider Reimbursement Manual, for all times relevant to this action, as "the practice of setting aside cash, or other liquid assets, in a fund separate from the general funds of the provider to be used for replacement of the assets depreciated, or for other capital purposes." PRM Sec. 226. In the belief that their bond reserve fund qualified as funded depreciation, the hospitals did not offset from their claimed interest expense the income they earned on the fund.
 
 
 36
 The intermediary allowed the interest expense incurred by the hospitals in connection with the bond issue. The intermediary then offset, however, the investment income earned on the bond reserve fund based on its determination that the fund was not funded depreciation. The intermediary took the position that borrowed money could not be used to establish funded depreciation. Because the hospitals funded their bond reserve fund with bond proceeds, therefore, the intermediary determined that the fund did not qualify as funded depreciation.
 
 
 37
 The Board modified the intermediary's decision, holding that while interest income did not have to be offset against allowable costs, the interest paid on the amount borrowed to fund the bond reserve fund would be disallowed. In so holding, the Board determined that the hospitals' bond reserve fund was funded depreciation. As a consequence, it applied section 226.5 of the Provider Reimbursement Manual, which at that time provided that "[w]hen a provider borrows money to make deposits of funded depreciation, interest paid by the provider on the money borrowed for this purpose is not allowable as cost."
 
 
 38
 The Deputy Administrator of the HCFA affirmed the Board's decision disallowing the interest expense as an allowable cost, stating that the interest expense was not "necessary" under 42 C.F.R. Sec. 405.419 because that part of the underlying loan was not made to satisfy the hospitals' financial need and was not for a purpose related to patient care. The magistrate upheld the agency's decision.
 
 B. Discussion
 
 39
 Resolution of this issue is complicated by the fact that the Secretary has taken two different approaches to the situation where, as here, a provider borrows money to establish funded depreciation. The two agency approaches are illustrated in this case by the intermediary's decision to offset interest income and the Board's modification to exempt interest income from offset while disallowing interest expense.
 
 
 40
 The first of the two agency approaches to this situation, as illustrated by the intermediary's decision, is to allow the interest expense under 42 C.F.R. Sec. 405.419(a), but to offset all investment income under 42 C.F.R. Sec. 405.419(b)(2)(iii). The offset requirement is held to apply on the theory that an account established with borrowed funds cannot qualify as funded depreciation under 42 C.F.R. Sec. 405.419(b)(2)(iii). This approach will be referred to as the "income offset" approach.
 
 
 41
 The second manner in which the Secretary has treated this situation, as illustrated by the Board's decision, is to treat the fund as funded depreciation. Under this approach, income earned on the fund is exempt from offset under 42 C.F.R. Sec. 405.419(b)(2)(iii), but the interest paid on money borrowed to establish the fund is disallowed because it is not a "necessary" expense under 42 C.F.R. Sec. 405.419(b)(2), as interpreted by section 226.5 of the PRM. This approach will be referred to as the "interest disallowance" approach.
 
 
 42
 The hospitals urge a third approach--one which treats their interest expense as an allowable cost and does not require the offset of investment income earned on the bond reserve fund. They argue that the interest expense associated with the bond issue is a necessary interest expense under 42 C.F.R. Sec. 405.419 and that income earned on the fund need not be offset because it qualifies as funded depreciation. They further argue that section 226.5 of the Provider Reimbursement Manual, which at that time disallowed interest expense on money borrowed for funded depreciation, was invalid as a "blanket disallowance" of costs under Northwest Hospital, Inc. v. Hospital Service Corp., 687 F.2d 985, 992 (7th Cir.1982).
 
 
 43
 We are substantially aided in our review of this issue by the First Circuit's consideration of the same issue in Cheshire Hospital v. New Hampshire-Vermont Hospitalization Service, Inc., 689 F.2d 1112 (1st Cir.1982). In that case, Cheshire Hospital incurred almost $9.5 million in debt through the issuance of revenue bonds by a state health authority. As required by the bond agreement, $880,000 of the proceeds were used to establish a bond reserve fund. In determining Cheshire's reimbursable costs, the intermediary utilized the income offset approach, allowing the interest expense but reducing it by the interest income earned on the fund. The Board and Secretary affirmed the intermediary's use of the income offset approach. The First Circuit, after discussing the agency's two approaches to this issue and concluding that both were consistent with the Medicare Act and regulations, ordered a remand to the Secretary with instructions to choose only one of the two approaches and to clarify that it alone would be applied in cases of this sort. 689 F.2d at 1126.
 
 
 44
 Four months after the Cheshire Hospital decision, the Secretary revised sections 226 and 226.5 of the Provider Reimbursement Manual to make clear that the agency would henceforth use the income offset approach to situations where a provider borrows money for funded depreciation. For cost reporting years beginning on or after December 1, 1982, section 226.5 provides that funds established with borrowed money will not qualify as funded depreciation, that interest on such borrowing is an allowable cost, and that income earned on the borrowed funds must be offset against interest expense.
 
 
 45
 The First Circuit's determination in Cheshire Hospital that both the income offset and interest disallowance approaches were reasonable interpretations of agency regulations was based on a careful analysis of the purpose of those regulations. The court found that the first purpose of the regulatory structure was to discourage Medicare-subsidized borrowing for funded depreciation. 689 F.2d at 1118-19. The court noted that the regulation defining funded depreciation describes it "as a means of conserving funds for the replacement of depreciable assets, suggesting that funded depreciation is to be financed by conserving operating revenues rather than through borrowing." Id. at 1125. The regulatory history of 42 C.F.R. Sec. 405.419 further supports the argument that the regulation was not intended to subsidize borrowing to finance funded depreciation:
 
 
 46
 The regulation in question was adopted pursuant to a suggestion made by the Health Insurance Benefits Advisory Council. The minutes of the Council's meetings indicate that one of the main reasons the Council decided to encourage funded depreciation was to obviate the need for providers to borrow funds for replacing depreciable assets, thereby reducing the amount of interest expense which would have to be reimbursed by Medicare. This purpose would obviously be thwarted if providers were permitted to borrow in order to finance funded depreciation.
 
 
 47
 Cheshire Hospital, 689 F.2d at 1125 (citation omitted).
 
 
 48
 The income offset approach achieves the purpose of discouraging borrowing to finance funded depreciation by "assur[ing] that a provider will not borrow money at Medicare's--and the taxpayer's--expense when it has investment funds available which could be applied to fill the need for capital" and by "guarantee[ing] that a provider will borrow only what is needed to fulfill capital requirements related to providing services under [Medicare], since the return on any excess borrowing will be recaptured" under the offset rule. Id. at 1118 (quoting Illinois Central Community Hospital, Inc. v. Schweiker, 1981 Medicare & Medicaid Guide (CCH) p 31,421, at 9120 (D.D.C. July 10, 1981)). The interest disallowance approach likewise deters borrowing to finance funded depreciation by ensuring that Medicare will not subsidize the cost of the borrowing.
 
 
 49
 The income offset approach has a second purpose in addition to discouraging excess borrowing, and that is to limit the amount of a provider's reimbursement to the actual or net cost of its borrowing. Cheshire Hospital, 689 F.2d at 1119; accord Abbott-Northwestern Hospital, Inc. v. Schweiker, 698 F.2d 336, 343 (8th Cir.1983). The income offset approach achieves this purpose by limiting reimbursement to the cost of the borrowing less any benefit derived therefrom. Such a determination "clearly serves the purpose of the Medicare Act which limits reimbursement to costs actually incurred by the provider." Cheshire Hospital, 689 F.2d at 1119.
 
 
 50
 The interest disallowance approach, on the other hand, provides that interest paid on money borrowed to establish funded depreciation is not an allowable cost at all. This rule comes from section 226.5 of the PRM, which in turn comes from 42 C.F.R. Sec. 405.419(b)(2). That regulation provides that only "necessary" interest is an allowable cost, and states that loans resulting in investments are not considered necessary for Medicare purposes. See id. Sec. 405.419(b)(2)(i); Cheshire Hospital, 689 F.2d at 1125. The regulation further provides that in order to be a necessary expense, interest must be incurred on a loan made for a purpose reasonably related to patient care. 42 C.F.R. Sec. 405.419(b)(2)(ii). The HCFA Deputy Administrator found that application of section 226.5 of the PRM in this case was consistent with both of those provisions since the portion of the bond proceeds used to establish the bond reserve fund was not borrowed to satisfy a financial need of the provider (i.e., resulted in excess funds or investments) and was not reasonably related to patient care. In regard to the first finding, the First Circuit has remarked that
 
 
 51
 [s]ince funded depreciation accounts may be reasonably considered as investments, albeit investments with the limited purpose of replacing depreciable assets, a rule which disallows interest reimbursement on loans used to finance these accounts would appear to be a reasonable interpretation of the regulation.
 
 
 52
 Cheshire Hospital, 689 F.2d at 1125-26. As for the second finding, we find no abuse of discretion in the Deputy Administrator's determination that the part of the loan used to finance the bond reserve fund was not reasonably related to patient care. It is true that the reserve fund was a necessary condition for the new bond issue, that the new bond issue was used to retire outstanding debt carrying higher interest rates, and that the outstanding debt had been incurred for hospital construction and equipment. We do not doubt that the hospitals benefitted financially by refinancing this old debt. But we hesitate to interpret the regulations as requiring the classification of every expense that even tangentially results in some financial benefit to a provider's overall operations as an expense reasonably related to patient care. We therefore believe that it was not unreasonable for the Deputy Administrator to interpret the regulations' "reasonably related to patient care" standard as requiring a more direct connection between the interest expense and patient care.[7] In sum, we agree with the First Circuit that both the income offset and interest disallowance approaches are reasonable interpretations of Medicare's regulations and are in accordance with the Medicare Act.
 
 
 53
 Lastly, we address the hospitals' contention that section 226.5 of the PRM, as in effect during the cost years in question, was invalid as a "blanket disallowance" of all interest expense incurred on money borrowed for funded depreciation. See Northwest Hospital, Inc. v. Hospital Service Corp., 687 F.2d 985, 992 (7th Cir.1982) (invalidating blanket disallowance of interest expense incurred on money borrowed from related parties). Contrary to the hospitals' position, we believe that section 226.5 is clearly distinguishable from the rule invalidated in Northwest Hospital. That rule disallowed any interest paid to related parties regardless of the purpose or reasonableness of the underlying loan. This court refused to apply the regulation because its blanket disallowance was "broader than either the language or the purpose of the Medicare statute can be construed to authorize." 687 F.2d at 992. We emphasized in that case, however, that we did not question the Secretary's authority to adopt, as a general matter, prophylactic rules designed to avoid potential abuse or the burden of multiple individual determinations. Id.; see Weinberger v. Salfi, 422 U.S. 749, 776, 95 S.Ct. 2457, 2472, 45 L.Ed.2d 522 (1975) (while prophylactic rules might in certain cases be underinclusive or overinclusive in light of their intended purpose, they are "widely accepted response[s] to legitimate interests in administrative economy and certainty of coverage"). We did not disapprove of all blanket disallowances, therefore, but rather only those so broad that their application is inconsistent with the rationale offered for the regulation, as was the case there. See Northwest Hospital, 687 F.2d at 992.
 
 
 54
 Section 226.5 of the PRM was in effect a blanket determination that money borrowed for funded depreciation was never "necessary," and that interest expense on that borrowing was therefore not a necessary expense under 42 C.F.R. Sec. 405.419. In contrast to the rule in Northwest Hospital, however, this blanket disallowance was a very narrow rule and was entirely consistent with the rationale for the regulation disallowing unnecessary interest expense. Funded depreciation gets special treatment under 42 C.F.R. Sec. 405.419(b)(2)(iii) as an incentive for providers to conserve funds for the replacement of depreciable assets. See 42 C.F.R. Sec. 405.415(e) (1984). When a provider borrows money to establish a funded depreciation account, however, and that account then earns investment income free from the offset requirement, it is not unreasonable for the Secretary to take away the special treatment. The disallowance in section 226.5 applied only to interest on money borrowed to establish funded depreciation. The hospitals concede that in all but the "rare case," borrowing to create funded depreciation is not necessary. In their own case, however, they argue that it was absolutely necessary to use bond proceeds to establish the bond reserve fund because there were no other resources available to contribute to the fund. Because section 226.5 failed to allow for this rare case where borrowing was necessary to create funded depreciation, the hospitals argue, it was invalid as a blanket disallowance. This is the type of blanket disallowance, however, that we implicitly approved in Northwest Hospital as an essential tool of the administrative process. It was narrowly drawn and was consistent with the rationale of 42 C.F.R. Sec. 405.419. We therefore reject the hospitals' assertion that section 226.5 was invalid under the principles enunciated in Northwest Hospital.
 
 
 55
 In conclusion, we affirm the magistrate's finding that it was not arbitrary, capricious, or an abuse of discretion for the Secretary to apply the interest disallowance rule to the hospitals' bond reserve fund. In so doing, we are mindful that it may be arbitrary and capricious for an agency to apply one rule in some cases and the other in other cases without acknowledging or explaining the inconsistency. See Cheshire Hospital, 689 F.2d at 1126. We do not believe that a remand is necessary in this case, however, as the agency has now adopted a consistent position for cost reporting years beginning on or after December 1, 1982. We therefore affirm the Secretary's application of the interest disallowance rule to Memorial and Herrin Hospitals in this case.
 
 ORDER
 
 56
 This court's decision on the family practice grant issue was not intended to be a final remand. Rather, we are retaining jurisdiction over Memorial's remaining two contentions with respect to that issue, which we decided on page 14 of the slip opinion not to address in light of our remand of the seed money grant question. The parties are ordered to inform the court of the agency's disposition of the seed money grant question within ten days of the agency's final decision, at which time this court will take whatever further action it deems necessary.
 
 
 57
 On consideration of the petition for rehearing filed in the above-entitled cause by Plaintiffs-Appellants, all of the judges on the original panel having voted to deny the same,
 
 
 58
 IT IS HEREBY ORDERED that the aforesaid petition for rehearing be, and the same is hereby, DENIED.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 The parties consented to trial by magistrate. See 28 U.S.C. Sec. 636(c) (1982); Fed.R.Civ.P. 73
 
 
 [2]
 The Social Security Amendments of 1983 instituted a prospective payment reimbursement system for cost years beginning on or after October 1, 1983. Pub.L. No. 98-21, Title VI, 97 Stat. 149 (1983) (to be codified at 42 U.S.C. Sec. 1395ww). Because this case involves the hospitals' 1977-80 cost years, however, this new system has no effect on the resolution of the issues in this case
 
 
 [3]
 42 C.F.R. Sec. 405.423 was eliminated on September 1, 1983. See 48 Fed.Reg. 39,752, at 39,811 (Sept. 1, 1983)
 
 
 [4]
 The Secretary contends that Memorial's grant does not exhibit the third feature of a seed money grant because section 612.2 requires a provider to become self-sufficient by the end of the grant period using funds received from patient revenues, not from other sources. Memorial stated in its grant application that it hoped to become nondependent on federal funds by the end of the grant period because it expected the state of Illinois to subsidize from 50 to 100% of the cost of resident education after the grant expired. If the state did not subsidize the full cost, the hospital and the School of Medicine would share the remaining costs, with income from patient care by residents defraying "a portion of" those costs. Memorial argues that section 612.2 clearly contemplates self-sufficiency based on revenues from non-patient sources because it anticipates the development of self-sustaining operation with funds received from Medicare reimbursement, other patients, "or other third-party payers."
 Because this dispute was not addressed by the Board, Deputy Administrator, or magistrate, we similarly decline to address it on appeal.
 
 
 [5]
 The Secretary's position that section 612.2 only covers grants for services is based on the language of that section, which defines seed money grants as grants "designated for ... expansion of services of established agencies" and states that seed money grants are "usually made to cover ... costs for services for a stated period of time...." This interpretation is consistent with the Secretary's contention that section 612.2 requires that the provider become self-sustaining by the end of the grant period based on patient revenues, because in general a hospital's provision of services will eventually produce patient revenues from Medicare reimbursement or other sources whereas a training program will not
 
 
 [6]
 The outstanding indebtedness had been incurred primarily to finance hospital construction and purchase hospital equipment
 
 
 [7]
 In support of their contention that the agency abused its discretion in this case by concluding that the interest borrowed to establish their bond reserve fund was not a necessary expense, the hospitals cite four agency documents taking the position that interest expense on bond reserve funds is a necessary and allowable cost under 42 C.F.R. Sec. 405.419. These documents merely illustrate the agency's alternate income offset approach, however, so uniformly take the further position that income earned on the bond reserve funds must be offset against allowable interest expense